
E-FILED
Monday, 26 September, 2005  02:15:52 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

WILLIAM DALE CARTER,

        Plaintiff,

v.                                                               03-CV-3065

TIM BAKER,
BILL ANDERSON,
BRENT FISHER,
ADAMS COUNTY JAIL BOARD,

        Defendants.

### Order

Before the Court is the defendants' motion for summary judgment (d/e 99). For the reasons below, the motion is granted in part and denied in part.

#### Motion for Leave to Supplement (d/e 114)

On August 15, 2005, the plaintiff filed a motion for leave to supplement his response to the defendants' motion for summary judgment. (d/e 115). The court agrees with the defendants that allowing the plaintiff to supplement his response at this late date (the summary judgment motion was filed in February, 2005) is unwarranted. The plaintiff has already responded, twice, to the summary judgment motion (he was given another chance after the court determined the required Rule 56 notice had not been sent). Allowing the response would cause unnecessary and unjustified delay in an aging case. In any event, even if the court allowed the supplemental response, the response would not change the court's ruling. The additional material consists primarily of affidavits of inmates corroborating the conditions at Adams County Jail, and affidavits of inmates vouching for the plaintiff's character. The plaintiff already submitted the former with his first two responses (though from different inmates), and the latter is unnecessary because the court draws any credibility questions in the plaintiff's favor for purposes of summary judgment.

#### Undisputed Facts

These facts are adopted from the defendants' proposed undisputed facts (d/e 100, p. 1 *et seq*.), to the extent supported by the defendants' cites to the record and to the extent not disputed by the plaintiff with admissible, competent evidence.

    1.      The plaintiff was transferred from Wyoming to Adams County Jail (the "Jail"), Illinois, on February 28, 2002, in relation to charges of home invasion and aggravated sexual assault.

    2.      At all times during the plaintiff's incarceration at the Jail, defendant Brent Fischer was and presently is the Sheriff of Adams County. (Fischer Aff.)[1]

    3.      At all times relevant, defendant Tim Baker was the Adams County Jail Administrator employed by the Adams County Sheriff's Department. (Fisher Aff.).

---

[1] Fischer's affidavit is docket entry 99, Attachment #1.

4. At all times relevant, defendant Bill Anderson was and is the Chief Deputy Sheriff employed by the Adams County Sheriff's Department. (Fisher Aff.).

5. The plaintiff was taking a prescription drug called Celexa at the time he was incarcerated at the Jail. It had been prescribed by a doctor at the Wyoming facility before the plaintiff was transferred to the Jail.

6. The plaintiff testified in his deposition that he believes Celexa is an anti-depressant, and that it was prescribed to him to treat his anxiety, stress and depression. (Plaintiff's Dep. p. $24^2$; d/e 112, Plaintiff's Supplemental Response, p. 8).

7. The plaintiff's health was otherwise fine when he entered the Jail. (Plaintiff's Dep. p.24).

8. The defendants assert that plaintiff missed doses of his Celexa for approximately two days. In the portions of the plaintiff's deposition cited, however, the plaintiff maintained that he received the Celexa only about half of the time he was in the Jail, and that weeks would go by after his prescription ran out before it was refilled. (Plaintiff's Dep. pp. 71-74). Prison logs indicate that the plaintiff's Celexa ran out around May 22, 2002, and was given to the plaintiff again on or around July 30, 2002. (d/e 99, attached Ex. 4).

9. On July 22, 2002, the plaintiff was taken to see Dr. Wright, who renewed the prescription for Celexa. (Plaintiff's Dep. pp. 71- 74). The plaintiff asserts that, before his appointment with Dr. Wright, the jailers had refused to refill his prescription, despite his verbal and written requests. (d/e 112, Plaintiff's Supplemental Response, p. 8). He asserts that the only reason the jailers finally took him to see Dr. Wright was because his defense attorney talked the Jail Administrator into it, though there is no affidavit from his defense attorney to this effect. (d/e 112, p. 16 (unnumbered); d/e 108, Ex. E).

10. The plaintiff testified that there were four sections for men on the second floor of the Jail, the floor on which he was incarcerated. (Plaintiff's Dep.p. 28).

11. The plaintiff was originally checked into Section 3 which contained eight cells (16 beds). All cells contained two beds, a toilet and a sink. (Plaintiff's Dep. p. 28, 29, 34, 54). The plaintiff described Section 3 as crowded and loud, with at least 24 inmates and sometimes more. (Plaintiff's Dep. p. 35).

12. There were three people in the plaintiff's cell in section 3–the plaintiff and two others. (Plaintiff's Dep. p. 30). The plaintiff describes the cells as generally 6 or 7 feet by 8 feet.

13. Upon incarceration at the Jail, the plaintiff was issued a sheet, a jumpsuit, and a pair of sandals. The plaintiff wore his own underwear, but he only had one pair–the pair he was wearing. (Plaintiff's Dep. p. 30 - 31). The plaintiff did not recall receiving a blanket or mattress initially, but he eventually did receive a mattress and had a mattress most of the time he was at the Jail, though he describes it as "cracked, split, broken, stinking . . . . If these are to be handled by any staff, they are sure to wear gloves for their own protection." (*Id.* pp. 32, 34; d/e 112, Supplemental Response, p. 7). The plaintiff slept on the top bunk for the duration of his stay in this cell in section 3, which held three inmates most of the time, but sometimes temporarily held four. (*Id.* at 33).

---

[2]The plaintiff's deposition is docketed as d/e 99, attached exhibits 15 et seq.

14. While he was in Section 3, the plaintiff spent the majority of time in his cell, though the cell door was generally open during the day. There was a day room to which he had access, which had two benches. (Plaintiff's dep. p. 35 - 38, 40). The plaintiff described the day room as little, crowded, loud, and filthy. (*Id.* p. 35-38, 40). He acknowledged that the day room was not as crowded early in the morning, and that he would sometimes walk up and down the hallway in the morning. (*Id.* p. 39 - 40). The plaintiff testified that it was too crowded in the hallways to exercise, that he did not exercise in the dayroom, even in the early morning hours because of the "filth, dirt and stink" and because it was "pressure-cooker situation"–too risky to turn one's back. (Plaintiff's Dep. p. 122). He also testified that the cell was too crowded for exercise, particularly with one of inmate's mattresses on the floor space. (*Id.* p. 123). He said he "saw once this old boy that sat on the bed and tried to do some–I don't know what you call it, some kind of backwards push up thing. He wasn't too successful at it." (*Id.*).

15. The only time the plaintiff left section 3 was to go to Court. (Plaintiff Dep. p. 37).

16. Section 3 did not have a television during the time that the plaintiff was incarcerated there. (Plaintiff's Dep. p. 38). Defendant Fischer avers that was because the television was being repaired. (Fisher Aff. Para. 16).

17. The plaintiff spent about two months in section 3, and was then moved from Section 3 to Section 1. He does not recall why he was transferred to section 1, but he had been asking to be moved to a quieter section. (Plaintiff's Dep. p. 34 - 35, 41).

18. Section 1 contained four cells (8 beds). The cell the plaintiff was in had two bunks and two other inmates besides the plaintiff. (Plaintiff's Dep. p. 41). The plaintiff did not have a mattress initially, and he had to sleep on the floor without one. He did eventually receive a mattress and slept on a mattress on the floor of the cell the majority of the time he was in section 1. (Plaintiff's Dep. p. 41).

19. Section 1 had no day room, but did have a six to seven foot wide hallway with a TV and a bench. (Plaintiff's Dep. p. 43 - 44).

20. Section 1 had fewer inmates total than section 4, and the plaintiff left his cell almost daily while in Section 1. (Carter dep. p. 44). The plaintiff testified that there were twelve to 15 people in section 1, sometimes four to a cell. (*Id.*). The plaintiff recalled staying in section 1 several weeks, but could not recall the exact duration.

21. On May 17, 2002, the plaintiff was transferred out of Section 1 to Section 4 due to an incident with an inmate Valentino Shine, where Shine struck the plaintiff with a mop bucket that had been left by staff (inmates were responsible for cleaning their own sections). According to the plaintiff, inmate Shine's attack was unprovoked. The plaintiff testified that, prior to Shine jumping him, Shine had been "picking on" other inmates in section 1, but had not, to his recollection, gotten into a fight with anyone else on section 1. (Plaintiff's Dep. p. 76). An inmate and a jail guard intervened to stop the attack. (Plaintiff's Dep. p. 77).

22. After the attack, the plaintiff was taken to the doctor, where he received stitches and/or staples, and was prescribed Tylenol 3 which he received. (Plaintiff's Dep. p. 65 - 67, 76). The plaintiff says that the doctor recommended x-rays be done, but the plaintiff's request for x-rays were denied. (Plaintiff's Dep. p. 75). Other than follow-up care for the plaintiff's injury, the plaintiff did not request to see a physician. (Plaintiff's Dep. p. 75). The plaintiff's stitches/staples were removed at a follow-up doctor visit.

23. The plaintiff believes that Shine was moved to Section 1 due to a fight, but he has no personal

knowledge of the rumored fight.  The plaintiff does not know of any other "dangerous" activity by Shine. (Plaintiff's Dep. p. 88 - 90).  The plaintiff submits an incident report on inmate Shine which indicates that Shine was moved from section 6 to section 4 on May 6, 2002, for verbally abusing and threatening the guards.  (d/e 108, Ex. B-1).  There is no information on when or why inmate Shine was moved to section 1.

24. Aside from the incident on 5/17/2002 with the plaintiff, there are no other incidents of fighting reported in the jail file for Shine. (Affidavit of Chad Downs).  A copy of the criminal history of Shine shows no history of violent crimes.  (Copy of /Police Record of Valentino Shine provided to Plaintiff in Response to Request to Produce dated 10/18/2004)(d/e 108, Ex. B-2).  He was apparently in the Jail on charges of unlawful possession of a controlled substance.  *Id.*  His prior convictions included the sale of narcotics, marijuana and controlled substances, stealing, forgery, theft, and escape.  *Id.*

25. There were three cells in section four (6 beds) and a "drunk tank" with no bed.  Section four had three, "and pretty regularly four" inmates to a cell during the plaintiff's stay there.  (Plaintiff's Dep. p. 53). Inmates rotated based on availability and seniority.  The plaintiff slept in all of the cells in Section 4.  The plaintiff voluntarily slept in the "drunk tank" in Section 4 several times if it was available because there was more room in the drunk tank.  He was never thrown in the drunk tank for his own conduct or as punishment. (Plaintiff's Dep. p. 49 - 52, 77, 90).

26. The plaintiff had a mattress the entire time that he was in Section 4.  He initially slept on the floor, and then he took a bunk that became available  (Plaintiff's Dep. p. 50).

27. The plaintiff stayed in section 4 for the rest of his incarceration at the Jail, until his transfer to the Illinois Department of Corrections in December, 2002.   (Plaintiff's Dep. 52).

28. In Section 4 there was a hallway about three feet wide that the inmates could go into during the day. (Carter Dep. p. 52).  There was no TV.  There was no common room. (Plaintiff's Dep. p. 52).

29. If a woman was put in the drunk tank in section four, the male inmates would have to leave the cell next to it empty, which resulted in "six and seven people in the last two cells." (Carter dep. p. 53, 93 -95).  The longest period this happened was a "couple of days." (*Id.* at 94). The plaintiff describes that situation thus: "When they'd crowd us in there six or seven it was standing room only for the whole time we was in there.  And that gets mighty stuffy and mighty crowded real quick and there's no way you can sleep when there's seven people in the cell in a six by eight room and that's not counting the beds.  Yeah, it gets pretty harry [sic] in there, really nerve racking and real quick."  (Plaintiff's Dep. p. 94).

30. During the plaintiff's incarceration at the Jail, guards would leave the inside cell lights on all night two or three times a week.  Not all the guards did this, just the "two or three jailers that was meaner than the rest of them."  (Plaintiff's Dep. p. 57).

31. Once a week or so a commissary list would be passed through the sections to order things to be purchased. CARTER always had money in his trust account provided by his parents. He could order basic toiletries and phone cards using the money in his account. (Plaintiff's Dep. p. 79 - 80).

32. The plaintiff spent $250 on phone cards during his incarceration from 2/2002 - 12/2002. (Plaintiff's Dep. p. 85).

33. The plaintiff acknowledges that he could have purchased toothpaste, toothbrush, soap, and shampoo from the commissary, but chose not to. (Plaintiff's Dep. p.79 -80, 85 - 87, 105 - 107).

34. Stamps, paper, and envelopes were not provided by the jail, but were available from the commissary. (Plaintiff's Dep. p. 107).

35. No prisoners were allowed to use the copy machine, even with their own money. The plaintiff says the guards told him that his attorney would have to make copies for him. (Plaintiff's Dep. p. 126).

36. Razors, shampoo and soap were provided each weekday morning if an inmate wanted to use them. (Plaintiff's Dep. p. 85 – 88, 107).

37. The plaintiff received three haircuts during the 10 months he was at Adams County Jail. (Plaintiff's Dep. p. 87).

38. Section 3 and Section 1 were at times locked down for various reasons, some unknown to the plaintiff. The plaintiff recalled that Section 3 was locked down 10 days total during his stay in section 3. (Plaintiff's Dep. p. 91 - 92).

39. Section 4 would be locked down if a detainee or female was brought to the drunk tank. (Plaintiff's Dep. p. 91 - 92). The longest time that the plaintiff can recall being in lock down was 10 days while he was in Section 4, probably for someone in the drunk tank. (Plaintiff's Dep. p. 92 - 93).[3]

40. The plaintiff believes that much of his outgoing mail was not mailed. He says that his defense attorney denied receiving mail he had sent to her, as did his parents. There are no affidavits from the attorney or the plaintiff's parents. (Plaintiff's Dep. p. 96 -103).

41. The plaintiff also sent an application pamphlet to "Heartland Range." The plaintiff believes that jail staff did not mail the pamphlet because he never received a response. (Plaintiff's Dep. p. 97 - 98).

42. The plaintiff did recall receiving the mail listed on the incoming mail log sheet and is not aware of any mail sent to him that was not received. (Plaintiff's Dep. p. 99, 101, Exhibit 8 to Carter's Dep.).

43. Jail procedure was that any outgoing mail had to be left open when provided to the jailer. Incoming mail was also opened. (Plaintiff's Dep. p. 99 - 100). All incoming mail was listed on the mail log, including any mail received from an attorney. (Affidavit of Chad Downs). The plaintiff testified that legal mail addressed to him was opened outside his presence, and that he sent a motion for substitution of judge in his criminal case that he does not believe was mailed. (Plaintiff's Dep. 100, 102).

44. No section on the plaintiff's floor was permitted to receive newspapers. (Plaintiff's Dep. p. 115 - 116).

45. The plaintiff was represented by an attorney for his criminal proceedings. (Plaintiff's Dep. p. 118 - 120). Betsy Bier, a public defender, represented him from the time of his arraignment throughout four days of trial. (Plaintiff's Dep. p. 26, 28). The plaintiff's parents lent him $1,500.00 to retain another attorney in regards to his sentencing hearing. (Carter dep. p. 26).

46. The plaintiff says he discussed the prison conditions with his attorney Betsy Bier, and the

---

[3] It is not clear whether the 10 days were consecutive.

<ol start="47">
<li>
possibility of suit. According to the plaintiff, Ms. Bier replied, "this jail is under the grandfather's rule. There's nothing you can do." (Plaintiff's Dep. p. 118).
</li>
<li>
There was a rolling rack about two feet wide where a few books were kept. Additionally, one guard would occasionally bring the plaintiff and other inmates a book. (Plaintiff's Dep. p. 134).
</li>
<li>
The plaintiff was allowed to keep his Bible with him in his cell. (Plaintiff's Dep. p. 129).
</li>
<li>
The plaintiff was able to see a minister once "almost every week". (Plaintiff's Dep. p. 131). The plaintiff recollects about six or eight times when the minister was turned away and not permitted to visit the prisoners. (Plaintiff's Dep. p. 131). There were times when the minister was not able to make it to see the plaintiff, even when the minister was there. (Carter dep. p. 130). There was no place of worship or other place where inmates could gather to practice their religion. (Plaintiff's Dep. p. 130).
</li>
<li>
As part of the normal course of business at the Jail, files are kept on each inmate, which includes all incident reports of inmate fights, mail logs, medical records, medicine logs, disciplinary reports and an accounting of the inmate's trust account. (Fischer Aff.).
</li>
<li>
As part of the normal course of business at the Jail, included in the inmate files are incoming and outgoing mail logs if mail was received or sent. (Fischer Aff.).
</li>
<li>
As part of the normal course of business at the Adams County Jail, incoming and outgoing mail is inventoried on the logs the day it is received or sent. The plaintiff's file contains an incoming mail log but no outgoing mail log. (Fischer Aff.). The plaintiff asserts he did try to send outgoing mail.
</li>
<li>
Defendants maintain that no written grievances were received from the plaintiff, but the plaintiff says he did file grievances, yet never received a response. The plaintiff asserts that he could not make copies of the grievances because inmates were not allowed to use the copy machine.
</li>
<li>
Jail visitor logs from March 8, 2002 through December 6, 2002, disclose that the plaintiff was visited by his legal counsel, Betsy Bier and Richard Scholtz on 20 occasions during his incarceration. (Fischer Aff.).
</li>
<li>
The plaintiff's trust account log shows that his account was opened on March 18, 2002 with a $10.00 deposit, a total of $414.86 was deposited thereafter and that Carter spent $250.00 on phone cards while incarcerated. Defendant Fischer avers that all necessary personal hygiene items such as soap, toothpaste and brushes, shampoo, and stamps, pens, paper, envelopes, candy, and snacks were available for purchase by the plaintiff with his trust account money. Barber services were also provided to the plaintiff. $3.15 remained in the plaintiff's account when he transferred to the IDOC. (Fischer Aff.).
</li>
</ol>

Analysis

I. <u>Claims that Survive Summary Judgment</u>

    <u>A: Overall Jail Conditions (14th Amendment)</u>

A pretrial detainee's constitutional rights arise from the due process clause of the Fourteenth Amendment, *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005):

[A] pretrial detainee "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*, 441 U.S. at 535, 99 S.Ct. 1861. Therefore, when assessing the constitutionality of the conditions or restrictions of pretrial detention, we must determine whether the conditions allegedly encountered by the detainee amounted to punishment. *Id*. at 536-37, 99 S.Ct. 1861; accord *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir.1996). However, as this court has made clear on a number of occasions, the mere fact that pretrial detention interferes with a person's desire to live comfortably and free from restraint does not, without more, make the conditions of that confinement unconstitutional. [citations omitted]. Rather, conditions of confinement which are "reasonably related to a legitimate and non-punitive government goal," are not unconstitutional, *Antonelli*, 81 F.3d at 1427-28 (citing *Bell*, 441 U.S. at 539, 99 S.Ct. 1861), and we caution that this court will give a high degree of deference to the discretion of prison administration to "adopt policies and practices to maintain the safety and security of this country's penitentiaries." [citations omitted].

*Board*, 394 F.3d at 478.

The court believes that a reasonable inference arises on the present record that the conditions of the Jail, viewed in their totality, were sufficiently serious to constitute punishment under the Fourteenth Amendment, particularly given the plaintiff's extended stay at the Jail–ten months. *See Demallory v. Cullen*, 855 F.2d 442, 445 (7th Cir.1988) (cruel and unusual punishment claim determined under the totality of the conditions). Specifically, these conditions were: overcrowding and unsanitary conditions that precluded any realistic opportunities for exercise and caused the plaintiff to sleep on the floor in unsanitary conditions (or on a filthy mattress on the floor); lack of adequate clothing and laundering; unsanitary conditions in general; and the lack of ventilation. The case cited by the defendants, *Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) involved 70 days of no yard while a prisoner was confined in segregation, but the plaintiff in *Thomas* had room to exercise in his segregation cell. Here, the deprivation lasted nearly 300 days, and, if the plaintiff is believed, there was no room to exercise, even inside, because of the crowded, filthy conditions. The plaintiff's testimony about the filthy mattress, lack of adequate clothing, infrequent laundering, filthy floors and mops, lockdowns with six or seven men to one cell, lack of air circulation in the summer, sleeping on the concrete floor, are all relevant to his claim of overcrowding/lack of exercise and intolerable conditions as a whole.[4]

Defendants are correct, however, that some of the conditions of the plaintiff's confinement do not implicate the Constitution. For example, some of the claims do not relate to the plaintiff's personal experience because they happened to other prisoners–i.e., that prisoners were held in the drunk tank naked. Other claims cannot be attributed to the defendants personally. For example, the plaintiff concedes that only certain guards refused to turn off the lights. Those guards are not in the case, and the defendants cannot be held liable for those guards' misconduct on a *respondeat superior* basis. Additionally, the plaintiff does not dispute he had plenty of his own money to buy hygiene items. It is not unconstitutional for the defendants to require him to purchase his own hygiene items if he is financially able.

B. Prohibition of Newspapers, Magazines, Books (1st Amendment)

Inmates retain First Amendment rights to receive reading material from outside of the prison, subject to the legitimate penological interests of the prison. *See, e.g., Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Turner v. Safley*, 482 U.S. 787 (1987); *Pell v. Procunier*, 417 U.S. 817 (1974). A prison rule restricting receipt of reading material survives constitutional scrutiny if it is "reasonably related to [a] legitimate penological interests." *Id.*

The only evidence in the record is that the Jail appeared to prohibit newspapers and magazines. There is no evidence about whether these restrictions were "reasonably related to legitimate penological interests." On the present

---

[4]The defendants point out that the Constitution does not require air conditioned jails. That may be true, but there is nothing in the record on how fresh air circulated in the Jail in the summer. For example, were there windows or fans? As to the lockdowns, even if the lockdowns were supported by security reasons, the fact that a lockdown in section 4 resulted in six or seven men per cell for days is relevant to the overcrowding/lack of exercise claim.

record, the court therefore cannot rule out a First Amendment claim. As to books, the Jail did allow some soft cover books, but it is not clear what its policy was on books sent by publishers or others to the Jail. Given the lack of record, the court cannot rule out a First Amendment claim based on a policy prohibiting books other than those provided by the Jail.

      C.  Defendants' Additional Objections to Claims Surviving Summary Judgment

   1)  Individual Capacity

The defendants argue that all claims against them in their individual capacity should be dismissed, because no inference arises that they were personally involved. It is true that the "the doctrine of *respondeat superior* can not be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable . . . . the supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)(citations omitted). Additionally, a supervisor can be liable if he is personally responsible for unconstitutional conduct–that is, the supervisor directed the conduct, or it occurred with the supervisor's knowledge and consent. *Chavez*, 251 F.3d at 651, *citing Gentry*, 65 F.3d at 561.

The court cannot rule out that defendants Baker, Anderson and Fischer were personally responsible on the surviving claims. They arguably knew about the conditions of the Jail and the policy on reading materials and were in a position to do something about it–they do not assert otherwise.

   2)  Official Capacity

Defendants Baker and Anderson argue that the suit against them in their official capacities should be dismissed as redundant. An action against a defendant in his or her official capacity is an action against the government entity. Defendant Fischer avers that Defendants Baker and Anderson held their positions "in the Adams County Sheriff Department," so it appears that an official capacity action against them is an official capacity action against the Sheriff's Office. However, the court does not believe it necessary to dismiss the official capacity case against defendant Baker and Anderson, as they remain in their individual capacity.

   3)  Defendant Adams County

Defendant Adams County argues that it should be dismissed because the Adams County Sheriff Office is the only proper governmental entity as a defendant. The Sheriff is responsible for day-to-day management of the Jail, but there is nothing in the record about which government entity is responsible with respect to the funding and design of the Jail. *See* 55 ILCS 5/5-1106 ("It shall be the duty of the county board of each county . . . [t]o erect or otherwise provide when necessary, and the finances of the county will justify it, and keep in repair, a suitable court house, jail and other necessary county buildings ..."); *Rapier v. Kankakee County, Illinois*, 203 F. Supp.2d 978 (C.D. Ill. 2002)(example of suit against county regarding jail conditions). Given the lack of record regarding how these responsibilities are divided, summary judgment is not appropriate for the County.

   4)  Exhaustion

The plaintiff insists that he did file grievances but never received responses. The defendants do not dispute that the copy machine was not available to inmates, so it is not surprising that the plaintiff has no copies of his grievances. Accordingly, an inference arises that no administrative remedies were available to the plaintiff. *Brengettcy v. Horton*, 2005 WL 2155656 *6 (7th Cir. 2005), *citing Lewis v. Washington*, 300 F.3d 829, 835 (7th Cir. 2002). Summary judgment therefore cannot be granted to the defendants on this ground.

5) Damages

    a) Physical Injury Requirement

Defendants are correct that the plaintiff cannot recover for mental or emotional injury suffered while in custody without a prior showing of physical injury. 42 U.S.C. § 1997e(e). The plaintiff says he hyperventilated, had headaches, aching joints, stiffness, and pain in his neck, head and shoulder. It is true that he testified that he is not sure if some of those symptoms resulted from Shine's attack or from the general jail conditions. However, it would be premature to rule out the possibility that the plaintiff suffered injuries from those conditions that might qualify as a "physical injuries" under 42 U.S.C. § 1997e(e). *See Delaney v. DeTella*, 256 F.3d 679 (7th Cir. 2001)(discussing physical symptoms of lack of exercise, but not addressing § 1997e(e)). The defendants may raise the argument again at the close of the plaintiff's case. If no physical injury has been proved, the plaintiff may still be able to recover nominal and/or punitive damages.

    b) Punitive Damages

Defendants are correct that punitive damages are not recoverable against municipalities in a § 1983 action. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981). The plaintiff therefore cannot recover punitive damages against the defendants in their official capacities or against the Adams County Jail Board. However, punitive damages might be recoverable against defendants Baker, Anderson and Fischer in their individual capacities.

II. Claims that do not Survive Summary Judgment

    A. Failure to Protect

A pretrial detainee's § 1983 claim falls under the Fourteenth Amendment due process clause, a protection "at least as great" as the Eighth Amendment's proscription against cruel and unusual punishment of a convicted inmate. *Board v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005). In *Board*, the Seventh Circuit explained:

> "'Under other constitutional provisions [such as the Fourteenth Amendment] … the standard for deliberate indifference appears closer to tort recklessness.'" [*Board.*, citing *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)]. In recognition of this, we have articulated the test for deliberate indifference for Fourteenth Amendment purposes to be "a conscious disregard of known or obvious dangers." *Armstrong*, 152 F.3d at 577 (quoting *West*, 114 F.3d at 651). However, considering "the difficulty of peering into minds [of government officials or institutions]," this distinction is of little significance in practical application. [citation omitted]. Thus, we have found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) "without differentiation." [citations omitted]. In either case the plaintiff has the burden of showing that: (1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to her health or safety. [citations omitted].

*Board*, 394 F.3d at 478.

The record allows no reasonable inference that the defendants consciously disregarded a known or obvious risk that inmate Shine would assault anyone. The plaintiff testified that Shine had been "picking on" other inmates, but there is no indication that any inmate complained about inmate Shine, or that Shine had a history of violence or fights in the Jail. The plaintiff testified that he believed Shine had been involved in a fight, but that conclusion is based on rumor. Shine's jail file indicates that Shine was involved only in the incident with the plaintiff–there is no record of a fight between Shine and any other inmate. There is no evidence that Shine had violent propensities. That Shine was disciplined for being verbally abusive to a guard is not enough to put these defendants on notice that Shine presented a physical danger to anyone.

The plaintiff argues that housing pretrial detainees with convicted inmates amounts to conscious disregard of obvious dangers. Shine's jail file shows that his prior convictions were for non-violent crimes, and there is no evidence that inmates with prior criminal records were more likely to fight than pretrial detainees.[5] The plaintiff does not recall witnessing any other fights during his ten month stay at the Jail. As to the mop bucket, there is no evidence that it had been used as a weapon during the plaintiff's ten-month stay there, other than Shine's attack, even though it was the Jail's policy to leave the mop bucket in the sections for cleaning. Allowing inmates unsupervised access to a mop bucket could be negligent, but negligence is not actionable under the Constitution. *See Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). Summary judgment is therefore granted to the defendants on this claim.

### B. Failure to treat medical needs.

The plaintiff says that, after the attack, the jail staff refused to follow up on the doctor's recommendation for x-rays. He also alleges that the staff withheld prescribed medication (Celexa) from him.

As with the above claim, a pretrial detainee's claim of inadequate medical care is brought under the due process clause of the 14th Amendment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Chavez v. Cady*, 207 F.3d 901, 904 (7th Cir.2000). A pretrial detainee must show that "(1) an objectively serious injury or medical need was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it." *Chapman*, 241 F.3d at 845; *Chavez*, 207 F.3d. at 904. An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845 (quotations omitted). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999)(quotation omitted).

The plaintiff has no evidence that he had a serious medical need for x-rays after the attack. He offers only inadmissible hearsay that the treating doctor said so. There is nothing in the record to explain why the plaintiff medically needed an x-ray or how it would have mattered in his treatment.

As to the Celexa, the plaintiff entered the Jail with a prescription of Celexa that ran out and took two months to refill. The jail logs show that the plaintiff received his Celexa daily before it ran out (except for two days), but the plaintiff says he did not. The court assumes for purposes of this order that the plaintiff had a serious medical need for the Celexa, since it was prescribed by a physician. The court also takes the plaintiff's word that he only received his Celexa about half the time he was in Jail. However, there is no evidentiary link between these failures and the named defendants. The plaintiff is vague about whether, when, how and from whom he sought to obtain the medicine.[6] He does say that his public defender talked the Administrator (presumably defendant Baker) into transporting the plaintiff to a doctor, who prescribed a refill. Yet that does not support an inference that Baker consciously disregarded the plaintiff's needs; it supports an inference that Baker took action once he was informed of the problem. In sum, to hold the defendants personally responsible on the present record would amount to holding them liable under a theory of *respondeat superior*. Summary judgment is therefore granted to the defendants on this claim.

### C. Interference with incoming and outgoing mail

The plaintiff alleges that about 80% of his correspondence addressed to his public defender did not reach her, but he assumes so only because she did not respond. He also believes an application he mailed was never sent, but again,

---

[5]In fact, it was the plaintiff who was charged with a violent crime, and eventually convicted of home invasion/armed/force. www.idoc.state.il.us.

[6]The plaintiff asserts he "notified Jailers verbally and in writing and grievances about not recieving [sic] his prescribed medication. Jailers would routinely [sic] let prescription run out, and then would not renew it for weeks at a time. . ." (Ex. 112, p. 16 (unnumbered)).

this conclusion is based on the addressee's lack of response. He maintains that soft-cover Christian books sent by his family were not delivered, but this remains a vague and undeveloped allegation as well.[7] On the present record, there is simply not enough evidence for a juror to rationally conclude that anyone interfered with the plaintiff's mail, much less that the defendants were personally responsible for any alleged interference. Summary judgment is therefore granted to the defendants on this claim.

D. Denial of Access to the Courts:

The plaintiff alleges that the Jail has no law library, notary public, no copy machine for inmate use, and no budget allowance for sending legal mail or providing stamps, envelopes, paper or pens. He also alleges that his access to his attorney was restricted.

An "access-to-courts claim exists only if a prisoner is unreasonably prevented from presenting legitimate grievances to a court; various resources, documents, and supplies merely provide the instruments for reasonable access, and are not protected in and of themselves. Thus, when a plaintiff alleges a denial of the right to access-to-courts, he must usually plead specific prejudice to state a claim, such as by alleging that he missed court deadlines, failed to make timely filing, or that legitimate claims were dismissed because of the denial of reasonable access to legal resources." *Ortloff v. United States*, 335 F.3d 652, 656 (7th Cir. 2003)(general allegations that destruction of legal papers prejudiced pending lawsuits did not state a claim).

Here, the plaintiff was not indigent. He does not assert that he was unable to buy the paper, pen and postage he needed to file documents in court. "[T]here is no constitutional entitlement to subsidy. . . . A right to petition for redress does not imply a right to free writing paper and stamps." *Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002); *see also Johnson v. Daley*, 339 F.2d 582, 586 (7th Cir. 2003)("Although prisoners enjoy a fundamental right of access to the courts . . . there is no right of *subsidized* access").

There is also no "abstract free-standing right to a law library or legal assistance." *Lewis v. Casey*, 116 S.Ct. 2174, 2179 (1996). The plaintiff maintains that he was unable to file a motion to substitute judge in his criminal case, but he was already being represented by an attorney in that case, so no access claim can arise there. He contends that he would have been able to file this civil lawsuit earlier with access to a law library in the Jail. Yet again, he does not explain why he could not have bought paper and pen and written to the court about the Jail conditions. His complaint need not be notarized, and the plaintiff could have informed the court about his inability to make copies.

According to the plaintiff, "over $40,000,00" in "public aid" money would have been saved if there had been a law library at the Jail. He attaches a December 3, 2004, state court order voiding earlier child support orders. (d/e 108, Ex. C-1.) That order granted the plaintiff's petition to void child support orders dated 11/1/01, 8/19/04 and a support judgment in a 1998 case. *Id.* There is no further information on what those orders were about, or the proceedings that resulted in those orders. The 11/1/01 order was entered three months before the plaintiff entered the Jail, and he does not adequately explain why he could not challenge it before his incarceration at the Jail, or write the court that entered the order during his incarceration at the Jail. The same goes for the 1998 case. The plaintiff does not even say he knew about these child support orders while he was in the Jail. The 8/19/04 order was entered when the plaintiff was in the IDOC–that appears to be the impetus for the plaintiff's court challenge, as he filed his petition the following September.

The plaintiff also asserts that he was denied access to lawyers–depending on the mood of jailers when the plaintiff asked to call his lawyer. He does not deny that his lawyers visited him 20 times during the course of his ten month incarceration. Nor does he explain what difference it would have made if he had always been allowed to call his attorney upon request. There is no suggestion that his attorneys were unable to contact him when necessary to his criminal case and sentencing. In any event, there is no evidentiary link between the alleged denial of phone calls and the defendants here. There is no evidence that the defendants were personally responsible for these deprivations.

---

[7]The plaintiff's allegation that legal mail was opened outside his presence is also undeveloped. In any event, there is no evidence linking the defendants to this alleged behavior.

11

Summary judgment is therefore granted to the defendants on this claim.

### E.  Equal Protection

The plaintiff alleges that televisions, newspapers and magazines were not allowed in sections 3 or 4, but were allowed in other sections.  As discussed above, the mail/newspaper rule was a blanket rule that applied to all the sections, as the plaintiff admitted in his deposition.  He does not dispute that the television in section three was being repaired.  That leaves only his claim that section 4 did not have a television while others did–a deprivation too *de minimis* to support a constitutional equal protection claim of unequal treatment.  In any event, the plaintiff has not developed this claim with any evidence.  There is no evidence that he was treated any differently than other similarly situated inmates or pretrial detainees.  Summary judgment is therefore granted to the defendants on this claim.

### F.  Denial of opportunity to practice religion

The plaintiff alleges that the Jail has no place for religious gatherings and few visits from ministers, who can only visit one cell at a time. (d/e 112, p. 16).  A lack of a separate room for religious gatherings alone does not amount to a denial of the plaintiff's right to practice his religion.  The plaintiff was permitted to have a Bible, as well as associate with other Christians in his section.  Similarly, the lack of a minister's presence on a more frequent basis does not amount to an affirmative restriction on religious practice.  There is no competent evidence that ministers were denied visits (the plaintiff's vague and unsupported allegations are not competent evidence), or that the Jail attempted to restrict the plaintiff from practicing his religion.  *See Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005)(no evidence that plaintiff couldn't practice atheism without weekly study group).  There is no evidence that other religions received more favorable treatment.  The plaintiff's major complaint appears to be that the Jail failed to actively facilitate and subsidize the practice of his religion, but that does not make out a constitutional violation.  In any event, the plaintiff has failed to develop this claim with evidence.  Summary judgment is therefore granted for the defendants on this claim.

IT IS THEREFORE ORDERED:

1) The plaintiff's motion to supplement is denied (d/e 114).

2) The defendants' summary judgment motion is granted in part and denied in part, as set forth above (d/e 99).

**The following claims remain for trial:**

    a)    The conditions the plaintiff endured at the Adams County Jail during his incarceration there in 2002 violated his Fourteenth Amendment right to due process, as set forth above.

    b)    The Adams County Jail's prohibition of newspapers, magazines, and books violated the plaintiff's First Amendment rights during his incarceration there in 2002.

3) **A final pretrial conference is scheduled for January 11, 2006, at 1:30 p.m., by video conference.**  The proposed final pretrial order shall be filed by December 23, 2006.  The proposed order must include the names of all witnesses to be called, including:  (1) the name, prison number, and place of incarceration for each inmate or pretrial detainee to be called as a witness; and, the names and addresses of any witnesses who are not incarcerated for whom the plaintiff seeks a trial subpoena.[8]  The plaintiff must provide the witness fee and mileage fee to any witness he seeks to subpoena and is responsible for timely requesting the subpoenas and serving them on the witnesses.  Fed. R. Civ. P. 45;

---

[8]The defendants are responsible for the initial preparation of the final pretrial order under Local Rule 16.3(I)(3).  *See Appendix 2* to Local Rules for a sample form.  www.ilcd.uscourts.gov/local rules

4) The court will draft its own proposed jury instructions and submit them to the parties at the trial.  The parties will have an opportunity at that time to review the instructions, make their objections, and propose additional or substitute instructions.

5)  **A jury trial on the remaining claims is scheduled for January 23, 2006, at 9:00 a.m.** at the U.S. Courthouse, 201 S. Vine St., Urbana, IL.  The plaintiff and the defendants shall appear in person before the court sitting in Urbana.  Inmate-witnesses of the Illinois Department of Corrections who are not parties to this case shall appear by video conference.

6) The Clerk is directed to issue appropriate process for the video appearance of the plaintiff at the final pretrial and for his personal appearance at the trial.  The Clerk is further directed to issue appropriate process for the video appearance of the inmate witnesses as listed in the final pretrial order.

Entered this 26th Day of  September, 2005.

s\**Harold A. Baker**

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE